**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Mid-America Gutters,
d/b/a The Guttershutter Co.,

    Plaintiff,

v.                                    Case No. 1:11cv843

Thompson Creek Window Co., *et al.*,     Judge Michael R. Barrett

    Defendants.

## ORDER

This matter is before the Court upon Defendants Thompson Creek Window Company and Rick Wuest's Motion to Dismiss for Failure of Service, Lack of Jurisdiction and Improper Venue or Motion to Transfer Venue. (Doc. 5.) Plaintiff Mid-America Gutters filed a Memorandum in Opposition (Doc. 9) and Defendants filed a Reply (Doc. 18).

**I.**     **BACKGROUND**

Plaintiff brings claims for (1) patent infringement; (2) copyright infringement; (3) breach of contract; (4) violation of Ohio Deceptive Trade Practices Act; (5) theft/conversion; and (6) misappropriation of trade secrets.

Plaintiff is an Ohio corporation with its principal place of business in Cincinnati, Ohio. (Doc. 2, ¶ 1.)  Defendant Thompson Creek Window Company is a Maryland corporation and Defendant Wuest is a resident of Maryland. (Id. ¶¶ 2, 3.)

Plaintiff alleges it is the owner of several patents related to a gutter-protection system. (Id., ¶ 9.) Plaintiff also alleges it owns a copyright in the advertising and promotional materials related to the gutter-protection system, as well as the trademarks

"Guttershutter," "Gutterstud," and "America's Finest Leaf and Debris System." (Id., ¶¶ 10-11.)

Plaintiff alleges that in September of 2003, Wuest contacted Plaintiff and requested additional information about the gutter-protection system. (Id., ¶ 12.) Plaintiff alleges that Wuest also visited Plaintiff's manufacturing and warehouse facility in Cincinnati, Ohio. (Id.)

Plaintiff alleges that it entered into a contract with Defendants which gave Defendants exclusive rights to use a custom gutter trough machine and install Plaintiff's gutter-protection system in a specified territory in Maryland. (Id., ¶ 13.) Plaintiff alleges that soon thereafter, Wuest and another Thompson employee attended sales training in Cincinnati. (Id.) Plaintiff alleges that in April 2004, Defendants took delivery of the gutter trough machine in Cincinnati. (Id., ¶ 14.) Plaintiff alleges that at that time, a Thompson employee was trained on that machine. (Id) Plaintiff alleges that in February of 2006, Wuest and other Thompson employees attended a dealer event in Cincinnati. (Id., ¶ 15.)[1] Plaintiff alleges that during that event, Defendants purchased another trough machine. (Id.) The trough machine included a counter which enabled Plaintiff to monitor the number of linear feet of its system being sold to Thompson. (Id.)

Plaintiff claims that Defendants' orders for materials decreased in February of 2008. After unsuccessful attempts to gauge the amount of product being produced using the counter on the trough machine, Plaintiff questioned whether Defendants were receiving materials from another source. Then, in August of 2011, Defendants gave 60-day notice that they would be terminating the contract with Plaintiff. Plaintiff claims that Defendants

---

[1]Defendants maintain that this event actually took place at the Belterra Casino in Indiana.

continue to use Plaintiff's machines and products.

Defendants dispute that there is a contract between themselves and Plaintiff. Defendants maintain that they entered into a "Dealership Agreement" with a different entity named "The Gutter Shutter Manufacturing Company," which was controlled by Lee Brown. Defendants explain that Brown is the named inventor of the patents at issue. Defendants claim that the Dealership Agreement gave them the right to operate a "Guttershutter dealership" and use the service marks at issue. Defendants claim that the Dealership Agreement did not place limitations on Defendants' use of the machines. In addition, Defendants claim that unbeknownst to Defendants, The Gutter Shutter Manufacturing Company sold its assets to Plaintiff. Defendants point out that the Dealership Agreement provides that the Agreement shall not be assigned without prior written consent.

Initially, Defendants argued that this case should be dismissed for lack of proper service. However, Defendants subsequently executed waivers. (Docs. 12, 13.) Defendants no longer maintain lack of service as a basis for dismissal. (Doc. 18, at 5 n.2.) However, Defendants still argue that Plaintiff's claims should be dismissed for lack of personal jurisdiction and improper venue, or in the alternative, should be transferred to another venue.

**II.     ANALYSIS**

    **A.     Motion to Dismiss Standard**

The plaintiff bears the burden of proving personal jurisdiction exists. *CompuServe Inc. v. Patterson*, 89 F.3d 1257, 1262-63 (6th Cir. 1996). In the face of a supported motion to dismiss, the plaintiff may not rest on his pleadings, but must, by affidavit or otherwise,

set forth specific evidence supporting jurisdiction. *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991) (citing Weller v. Cromwell Oil Co., 504 F.2d 927, 930 (6th Cir. 1974)). When the Court considers a motion to dismiss pursuant to Rule 12(b)(2) without an evidentiary hearing, the plaintiff "'need only make a prima facie showing of jurisdiction.'" *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002) (quoting Neogen Corp. v. Neo Gen Screening, Inc., 282 F.3d 883, 887 (6th Cir. 2002)) (internal citation omitted). The plaintiff can make this prima facie showing by "'establishing with reasonable particularity sufficient contacts between [the Defendant] and the forum state to support jurisdiction.'" *Neogen Corp.*, 282 F.3d at 887 (quoting Provident Nat'l Bank v. California Savings Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987))

### B.    <u>Personal Jurisdiction</u>

The Sixth Circuit has established a two-step inquiry to determine whether a federal district court sitting in a diversity-of-citizenship case can exercise personal jurisdiction over a defendant: (1) whether the law of the state in which the district court sits authorizes jurisdiction, and (2) whether the exercise of jurisdiction comports with the Due Process Clause. *CompuServe*, 89 F.3d at 1262.

The Sixth Circuit has explained that there are two kinds of personal jurisdiction: general and specific jurisdiction. *Nationwide Mut. Ins. Co. v. Tryg Int'l Ins. Co.*, 91 F.3d 790, 793 (6th Cir. 1996) ("Jurisdiction may be found to exist either generally, in cases in which a defendant's "continuous and systematic" conduct within the forum state renders that defendant amenable to suit in any lawsuit brought against it in the forum state . . . or specifically, in cases in which the subject matter of the lawsuit arises out of or is related to

4

the defendant's contacts with the forum."). Plaintiff argues that both general and specific jurisdiction exist in this case. However, there has been some debate as to whether Ohio courts recognize general jurisdiction. *See Indus Trade & Technology, LLC v. Stone Mart Corp.*, 2011 WL 6256937, *2, n.1 (S.D.Ohio Dec.14, 2011) (describing split on whether general personal jurisdiction is available under Ohio law). The Sixth Circuit has recently stated that "under Ohio law, a court may exercise personal jurisdiction over a non-resident defendant only if specific jurisdiction can be found under one of the enumerated bases in Ohio's long-arm statute." *Conn*, 667 F.3d at 718. Accordingly, this Court will only analyze whether specific jurisdiction exists under Ohio law.

### 1. Ohio's long-arm statute

Plaintiff relies on the following provision of Ohio's long-arm statute to establish personal jurisdiction:

> A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's:
>
> (1) Transacting any business in this state;

Ohio Rev. Code § 2307.382(A). The Ohio Supreme Court has explained that this provision "is very broadly worded and permit[s] jurisdiction over nonresident defendants who are transacting any business in Ohio." *Kentucky Oaks Mall Co. v. Mitchell's Formal Wear, Inc.*, 559 N.E.2d 477, 481 (1990); *see also Brunner v. Hampson*, 441 F.3d 457, 464 (6th Cir. 2006) ("[t]he term 'transacting any business' as used in . . . the statute . . . will be given broad interpretation.") (quoting Ricker v. Fraza/Forklifts of Detroit, 828 N.E.2d 205, 209 (Ohio Ct. App. 2005)).

Plaintiff points to the contract between Plaintiff and Defendants. However,

Defendants claim they entered into a contract with The Gutter Shutter Manufacturing Company, not Plaintiff. The Court finds it unnecessary at this stage of the proceedings to make a determination on this issue because this Court must accept as true Plaintiff's assertions that a contract existed between the parties. *PTG Logistics, LLC v. Bickel's Snack Foods, Inc.*, 196 F. Supp. 2d 593, 598 (S.D. Ohio 2002) (citing Advanced Polymer Sciences, Inc. v. Phillips Industrial Services, 34 F.Supp.2d 597 (N.D.Ohio 1999)). Moreover, as the Ohio Supreme Court has explained:

> It is clear that R.C. 2307.382(A)(1) and Civ.R. 4.3(A)(1) are very broadly worded and permit jurisdiction over nonresident defendants who are transacting any business in Ohio. "Transact," as defined by Black's Law Dictionary (5 Ed.1979) 1341, "*** means to prosecute negotiations; to carry on business; to have dealings ***. The word embraces in *its meaning the carrying on or prosecution of business negotiations* but it is a *broader term than the word 'contract' and may involve business negotiations* which have been either wholly or partly brought to a conclusion ***." (Emphasis added.)

*Kentucky Oaks Mall Co.*, 559 N.E.2d at 480.

"Solicitation of business by an out-of-state corporation is a factor to be assessed in determining whether the foreign company was transacting business in Ohio for purposes of submitting to personal jurisdiction." *Ricker v. Fraza Forklifts of Detroit*, 828 N.E.2d 205, 209 (Ohio Ct. App. 2005) (citing U.S. Sprint Communications Co., Ltd. Partnership v. Mr. K's Foods, Inc., 624 N.E.2d 1048, 1052 (Ohio 1994)). In addition, a court must consider "in which jurisdiction the parties undertook their discussions and communications, and on what terms." *Ricker*, 828 N.E.2d at 209. Finally, a court must consider whether the foreign company becomes obligated to make payments to an Ohio-based plaintiff. *Hammill Mfg. Co. v. Quality Rubber Prod's, Inc.*, 612 N.E.2d 472, 374 (Ohio 1992) (concluding that nonresident corporation is "transacting business" in Ohio where it "initiates, negotiates a

contract, and through the course of dealing becomes obligated to make payments to an Ohio corporation"); *Kentucky Oaks Mall Co.*, 559 N.E.2d at 480 (holding that "a commercial nonresident lessee, for purposes of personal jurisdiction, is 'transacting any business' within the plain and common meaning of the phrase, where the lessee negotiates, and through the course of dealing becomes obligated, to make payments to its lessor in Ohio.").

It appears that the parties agree that Plaintiff sent a mailer to Defendants, and Wueste responded to the mailer, but the parties disagree as to who initiated the actual business relationship. The Court finds Plaintiff's mailer, sent directly to Defendants, was what initiated the business relationship between the parties. However, the question of who initiated the business dealings is not itself determinative as to whether a defendant transacted business in Ohio and submitted to personal jurisdiction. *Ricker*, 828 N.E.2d at 209 (citing U.S. Sprint Communications, 624 N.E.2d at 1052) (explaining that mere solicitation of business does not constitute "transacting business"). Therefore, the Court will determine whether the discussions and communications between the parties occurred in Ohio.

Plaintiff has identified two undisputed occasions where Thompson employees traveled to Plaintiff's headquarters in Cincinnati. The first was in 2003, when Wuest visited Plaintiff's facility and met with Plaintiff's owner. The second was in 2004, when Wuest and another employee came to Cincinnati to participate in a training program. Plaintiff identifies a third visit in February of 2006, but Defendants explain that the dealer event which Plaintiff has identified actually took place at the Belterra Casino in Indiana. The fourth visit was a "Closers Camp" held in Ohio, but Defendants have no recollection or records of attending this event. (Doc. 18-1, Rick Wuest Decl., ¶ 8.)

7

Defendants point out that the Dealership Agreement between The Guttershutter Manufacturing Company and Thompson Creek was reached in Maryland. (Wuest Decl., ¶ 5.) Defendants explain that two representatives of The Guttershutter Manufacturing Company visited Thompson Creek to finalize the agreement. (Id.)

Plaintiff explains that in April 2004, Defendants ordered a trough machine which was delivered to Plaintiff's manufacturing facility. Plaintiff claims that Defendants sent an employee to pick up the machine and participate in a week of training on the machine. Defendants do not dispute these facts, but point out that a second trough machine was shipped to them in Maryland. (Id., ¶ 7.) Plaintiff also explains that Defendants ordered all their supplies and materials from Plaintiff's office in Cincinnati, which required Defendants to make regular email and telephone communications to Ohio. Plaintiff states that it sent invoices to Defendants, who then sent payment to Plaintiff in Cincinnati.

The Court finds that there is little in these facts to distinguish this case from the case before the Ohio Supreme Court in *Kentucky Oaks Mall Co. v. Mitchell's Formal Wear* where the court found that:

> In the case at bar, Mitchell's negotiated the lease by telephone contact to Ohio with an Ohio-based limited partnership. Mitchell's intentionally and voluntarily entered into a ten-year contract by signing the document in Georgia and mailing it to Ohio. The document creates ongoing duties and obligations for the life of the contract. Undoubtedly, both parties sought the benefit of each other's bargain in hopes of realizing a pecuniary gain. The fact that Mitchell's maintained no physical presence in Ohio does not preclude a finding that it transacted business in this state.
>
> Thus, we are convinced that Mitchell's conduct falls unequivocally within the plain and broad language of R.C. 2307.382(A)(1) and Civ.R. 4.3(A)(1).

559 N.E.2d at 480. Similarly, in *Hammill Manufacturing Co. v. Quality Rubber Products, Inc.*, the Ohio Supreme Court found that:

> In the case at bar, QRP negotiated the contract by telephone contact to Ohio with an Ohio-based corporation. QRP intentionally and voluntarily entered into a contract by issuing the purchase order in California and mailing it to Ohio. The document creates ongoing duties and obligations for the life of the contract. Undoubtedly, both parties sought the benefit of each other's bargains. The fact that QRP maintained no physical presence in Ohio for the initial contract does not preclude a finding that it transacted business in this state.

612 N.E.2d at 374.

Here, Defendants intentionally and voluntarily entered into a contract with Plaintiff. Under this Dealership Agreement, Defendants had continuing obligations that connected them to Ohio. Therefore, the Court concludes that Defendants were "transacting business" in Ohio.

### 2. Due Process

However, the Court finds that Plaintiff has not met the necessary due process requirements. To comport with due process, an exercise of personal jurisdiction requires that a defendant "have certain minimum contacts such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The Sixth Circuit has set forth a three-part analysis to determine whether jurisdiction accords with due process:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000) (quoting Southern Mach. Co. v. Mohasco Indus., Inc., 401 F.2d 374, 381 (6th Cir. 1968)).

"The 'purposeful availment' requirement is satisfied when the defendant's contacts with the forum state 'proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State,' and when the defendant's conduct and connection with the forum are such that he 'should reasonably anticipate being haled into court there.' *CompuServe*, 89 F.3d at 1263 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474-75 (1985)).

This Court finds that Defendants' contacts with Ohio and Defendants' conduct and connection with Ohio are indistinguishable from those in *Calphalon Corp. v. Rowlette*, wherein the Sixth Circuit found that the defendants did not purposefully avail themselves of the benefits of the laws of Ohio. 228 F.3d at 722. Calphalon was an Ohio corporation. *Id.* at 720. Defendant Rowlette was a Minnesota corporation and did not own any property in Ohio. *Id.* The parties entered into a series of agreements by which Rowlette served as Calphalon's exclusive manufacturer's representative in Minnesota, Iowa, North Dakota, South Dakota and Nebraska. *Id.* Rowlette communicated with Calphalon through letters, faxes and telephone calls to Ohio. Rowlette made two visits to Ohio: the first for a mandatory sales meeting, and the second for a tour of Calphalon's facilities. The final agreement between the parties provided that "this Agreement shall be interpreted under the laws of the State of Ohio." *Id.* Through a letter from counsel, Rowlette claimed breach of contract, and Calphalon filed suit for declaratory judgment. *Id.* at 721.

The Sixth Circuit noted that "the mere existence of a contract between Rowlette and an Ohio citizen for seventeen months is insufficient to confer personal jurisdiction over Rowlette." *Id.* at 722. The court explained that the focus should be on the quality of the

parties' relationship, rather than the duration of the relationship.  *Id.*  In this vein, the court noted that Rowlette's obligations under the agreement were to be performed outside of Ohio and Rowlette was not seeking to exploit a market for Calphalon's products in Ohio.  *Id.*  The court explained that these facts did not support jurisdiction:

> In *Kerry Steel Inc. v. Paragon Industries, Inc.*, 106 F.3d 147, 151 (6th Cir. 1997), we held that an out-of-state defendant-buyer did not purposefully avail itself of the benefits and protections of the forum state's laws because, in part, no facts connected the subject matter or performance of the contract at issue to the forum state.  Furthermore, we held that any negative economic effect on the in-state plaintiff-seller did not create a determinative impact on the state economy, as " 'the locus of such a monetary injury is immaterial, as long as the obligation did not arise from a privilege the defendant exercised in the forum state.' "  *Id.* (quoting LAK, 885 F.2d at 1303).

*Id.*  The court also noted that Rowlette's communications and visits to Ohio resulted not because Rowlette chose to create continuous and substantial consequences in Ohio, but because Calphalon chose to be headquartered there.  *Id.* at 723.  The court also stated that "[a]rguably, Rowlette would have served as Calphalon's representative in the designated states, regardless of Calphalon's base of operation."  The court concluded that "Rowlette's contacts were precisely the type of "random," "fortuitous," and "attenuated" contacts that the purposeful availment requirement is meant to prevent from causing jurisdiction."  *Id.*

The *Calphalon* court then noted that the "arising from" requirement under the second prong "is satisfied when the operative facts of the controversy arise from the defendant's contacts with the state."  *Id.* (citing Southern Machine, 401 F.2d at 384).  In addition, because the defendant's connection with Ohio was not substantial as required by the third prong, "it is necessary for the plaintiff to demonstrate that the facts at issue

11

actually occurred in the forum state." *Id.* at 724 (citing Southern Machine Co., 401 F.2d at 381). Here, Defendants' performance of the terms of the agreement between the parties occurred in Maryland. Similarly, any use of Plaintiff's patents, copyrights, and trademarks also occurred in Maryland, and any facts related to deceptive trade practices, theft, conversion, or misappropriation of trade secrets would have occurred in Maryland.

Based on the foregoing, the Court concludes that it does not have personal jurisdiction over Defendants.

### C. Motion to Transfer Venue

Defendants also move to transfer venue to Maryland pursuant to 28 U.S.C. § 1404, which provides that "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district court where it might have been brought." However, this Court may not transfer under section 1404(a) where personal jurisdiction over the defendants does not exist. *Pittock v. Otis Elevator Co.*, 8 F.3d 325, 329 (6th Cir. 1993) (citing Martin v. Stokes, 623 F.2d 469, 474 (6th Cir. 1980)). Instead, 28 U.S.C. § 1406(a) "provides the basis for any transfer made for the purpose of avoiding an obstacle to adjudication on the merits in the district court where the action was originally brought." *Martin*, 623 F.2d at 474; *see also Taylor v. Love*, 415 F.2d 1118 (6th Cir. 1969) (district court has power to transfer complaint to another district even if it did not have personal jurisdiction), *cert. denied*, 397 U.S. 1023 (1970). While Defendants brought their motions to transfer in the alternative in the event the motions to dismiss were denied, this Court may *sua sponte* order that a case be transferred, rather than dismissed pursuant to Section 1406. *Thornton v. Walter*, 1985 WL 13711, *2 (6th Cir. Sept. 17, 1985) (per

curiam).

Section 1406(a) provides that a district court with a case "laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." The Sixth Circuit has adopted a broad construction of this provision and explained that "[t]he law in this Circuit, therefore, is that § 1406(a) provides the basis for any transfer made for the purpose of avoiding an obstacle to adjudication on the merits in the district court where the action was originally brought." *Martin v. Stokes*, 623 F.2d 469, 474 (6th Cir. 1980).

There is no dispute that this case could have been brought in the United States District Court for the District of Maryland. Furthermore, this Court finds that it is in the interest of justice to transfer this case. Therefore, the Court concludes that transfer, as opposed to dismissal, is the proper course of action.

### III.  CONCLUSION

Based on the foregoing, Defendants Thompson Creek Window Company and Rick Wuest's Motion to Dismiss, or in the Alternative, to Transfer Venue (Doc. 5.) is **GRANTED** on grounds that this Court lacks personal jurisdiction over Defendants. However, pursuant to 28 U.S.C. § 1406(a), this matter is hereby **TRANSFERRED** to United States District Court for the District of Maryland.

**IT IS SO ORDERED.**

           */s/ Michael R. Barrett*
           Michael R. Barrett
           United States District Judge